Gaston, Judge,
after stating the case as above, proceeded as follows: Upon the. argument, it was admitted, by the counsel for the defendants, that the 4th exception taken by the plaintiff, was well founded. That exception is, for that the master has erroneously debited the estate of Samuel L. Wiggins, in account with Thomas Walker, as executor, with the sum of $12, and the interest thereon; which sum was Paid for a survey of land made after the death of his testator, Without, therefore, enquiring into the matter of the exeeption, and because of this admission, the Court doth sustain the said exception.
At the same time, the counsel for the plaintiff waived the 3rd, 12th, 18th and 20th exceptions. These, therefore, are regarded as withdrawn; and the Court hath in no way pass-
With respect to the matters embraced within the remaining exceptions, the Court hath minutely inspected the testimony which has been referred to as bearing upon them, and deliberately considered it. Upon each of these exceptions, it has not been enabled to come to a conclusion with the same confidence — but it has not found any one sustained to its satisfaction. All these exceptions, therefore, are over-ruled.
Our views upon them will be briefly stated.
The first exception is, for that the master hath erroneously debited the estate of Samuel L. Wiggins with the sum of £8 2s. 3d. paid in discharge of an account of Horace Ely. *99 The proof of payment of this account- by the Thomas Walker, is full and uncontested; but the objection that the estate ought not to be charged therewith, is for that the account itself was not a just one. In support of this objection, the plaintiffs rely on a due bill given by Wiggins to Ely, dated the 28th of March, 1816, for £3 6s. Id., professing to be for a balance found due upon a settlement of accounts between them, up to the 1st day of January, 1816, and upon the fact appearing on the face of this disputed account, that all the items therein charged, with the exception of the last item for the laying of three grubbing hoes, £1 10s., on the 3rd of January, 1816, are antecedent to the date of the said settlement. The settled account, on which the note or due bill was given, does not appear, so that we cannot certainly know the items of which it was composed. It does appear, however, that the deceased, Mr. Wiggins, dealt' extensively with Mr. Ely, as his merchant; and the disputed account is exclusively for blacksmit s work, done at the shop of the latter. Although this circumstance alone would not repel the conclusion that this account, except as to the last item, was comprehended in the settlement upon which the due bill was given, yet it comes in aid of the testimony o ' . ** of Mr. Ely before the master, that it was not embraced in that settlement, and was wholly due from Wiggins at his death. We cannot say, therefore, that Thomas Walker committed a devastavit in paying it. .
The ^™ptld°une bin, pro-have been fsvee("le^pe0n" of ail the jKjoounts between the ?f jts date, particular contracted £b^l¿”t0 by shewing ^embraced the settlement.
The second exception- is, for that the master hath debited the estate with sundry payments, made by Thomas Walker, on account of a judgment of David Clarke, against the utors of S. L. Wiggins, amounting to the sum of $362 06 cents. The facts in relation to the subject matter of this exception, are few and not disputed.
.On the 1st of May, 1815, the late S. L. Wiggins became indebted on a- bond lor the sum of f>88 20 cents, payable to David Clarke, on the 1st of January thereafter; which bond he executed jointly with Charles Blount, at the request and as the surety of the said Blount. On this bond, in November, 1822, an action was brought by the obligee, and after many delays, judgment was obtained. This- judgment, *100 Charles Blount having become absolutely insolvent, was off by Thomas Walker, as executor of Wiggins. The objection of the plaintiffs is for that it was the duty of the under our actof 1789,1 Rev. Stat. ch. 46, sec. 16, and ch. 65, sec. 12, to advertise for creditors to prefer their claims, those within the State, before the expiration of two years, and those without the State, within three years after the qualification of the executors; and when sued after the expiration of such time by a creditor, to plead the advertisement and lapse of time in bar of his recovery.
A i execu.tor has an honest dispicad,"or* plead* the statute or to'a'c'iaim against his i estatores estate.,
We are very certain that’ the doctrine, as thus laid down, has never yet received the sanction of the Courts of justice in this State. In a large number — perhaps a majority of cases of executors and administrators, advertisement is not so made as to enable them to set up the bar of the act of 1789; and we are yet to learn, that it has ever been held, that the payment of a just debt, which might have been evaded, had the advertisement been made in due form, and the executor or administrator had chosen to plead the statute against it, was adjudged a devastavit. Certainly executors and administrators ought, in prudence, to comply with the requisitions of the act in question; and if, by failing so to do, they subject the estate to the payment of what it does not oioe, they, and not the estate, should bear the loss. But the legatees, or next of kin cannot, in conscience, object to a payment, whether voluntary or compulsatory, made by the representative of the estate, of what was justly due therefrom, in equity — as respects legatees or next of kin — the estate consists only of what remains, after satisfaction of the creditors. That an executor is not bound to plead a statute of limitations against the claim of an honest creditor, we have ° been accustomed to regard as the undisputed law of our State, handed down to us from its first settlement. The couusel f°r fhe plaintiffs supposes that a mistaken notion has prevailed on this subject; and in support of that supposition, refers us to some incidental remarks made by Mr. Justice Bayley, in the case of McCullock vs. Dawes, reported 9 Dow. & Ry. 40, (22 Eng. C. L. Rep. 386.) These remarks must be understood with reference to the circumstances of *101 the case then under consideration — a claim by open account against the estate of a deceased man, more than twenty ,, -7 , years old; and which, without clear evidence to the contrary, must be presumed to have been paid. An executor who did not resist such a .claim, would justly render himself lia^ ble over to those who were interested in the testator’s property. The payment of such a claim would properly subject him to the charge of unfaithfulness to his cestuy que trusts. In Williams’s Treatise on the Law of Executors and Administrators, among the latest and best upon the subject, it is laid down that an executor is not bound to plead the statute of limitations to an action commenced against him by a credit tor of the testator; nor will equity compel him to plead it, upon a bill by the residuary legatee; and the most authoritative references are given in support of these positions. See 2 Williams on Ex’rs. & Adm’rs. 1110. And in Shewen vs, Vander horst, 1 Russ. &. Myl. 347 (4 Eng. Con. Ch. Rep. 458,) where the late Master of the Rolls and the late Lord Chancellor held, that after a decree was pronounced against the executor, by which the estate was taken out of his pos? session, and vested in the Court for the purposes of distribution, and the accounts ordered to be taken, and the assets administered in the master’s’office, the common law power of the executor to waive the bar of the statute was gone, and any persons parties to the suit might set it up — it is most unequivocally recognized, that until.such a decree rendered, the executor has an honest discretion to plead or not to plead the statute.
There might, perhaps — we do not know, however, if it be so — there might, perhaps, be some objections to the sums paid, because of costs unnecessarily incurred. The exception, however, is placed solely on the principle that it was the duty of the executors to protect the estate from the payment of the debt — because they might have barred a recovery of it, under the act of 1789. — and this principle we do not admit.
The 5th, 6th and 21st exceptions relate to one and the same subject, and may properLy be considered together. The material facts, as found by the report, may be briefly stated *102 as follows: On the 4th of December, 1817, Samuel L. WigS*ns’ at re0uest °f Abraham 'Howett personally, became a surety or endorser on a note, purporting to be made by A-f,ra^lam Howett and Company, payable eighty-eight days after date, at the Edenton Branch of the State Bank, to John B. Blount, Cashier thereof; which note was shortly after discounted at the said Bank, at the instance of the said Abraham Howett, and the proceeds thereof received by the said Abraham. Before the day of payment arrived, Abraham Howett became insolvent, and left the country; and a few weeks after the day of payment, Samuel L. Wiggins died. It was not known who, besides Abraham Howett, composed the firm of Abraham Howett & Co.; but it was suspected, by the executors of Wiggins, that a certain William L. Chesson was a member thereof; and, in the hope of being able to establish this fact, and to save the estate of their testator, they caused a suit to be brought by the Bank in the nameof Blount, the Cashier, against said Chesson, as one of the makers of the said note. Upon the trial,' they were unable to shew Chesson a member of the firm; and therefore, the plaintiff was non-suited. Howett being insolvent and run away — and being unable to fix the liability of the note upon any other person —Thomas Walker paid the amount of the note and interest; and the master has credited the said Thomas, and debited the estate in account with the amount of the payment thus made. The plaintiffs object to this finding of the master upon many grounds. In the first place, they insist that there is no evidence that such a note ever was given, because the best testimony, the note itself, is not exhibited. The defendants, Maitland and Jordan Walker, have both made affidavit before the master, that they have been unable to find the original note, after making diligent search therefor; know not where it is to be obtained; and believe that it is lost. According to the matter by them alleged, the original, if in existence, ought to be among the papers of their testator — unless it was left in the Bank after payment, as a cancelled note. The agent of the Bank, entitled to the custody ofsueh papers, has sworn that he has it not; and that many papers of the Bank, and amongst them cancelled notes, have been *103 destroyed by fire. The way is thus fully opened for dary evidence; and the secondary evidence is plenary. It is then objected that the payment of the note is not proved, except by an ex parte affidavit of John B..Blount, which is denied to be evidence — -and if payment be proved, it is shewn to have been made by Thomas Walker. But this °k" jection fails. John B. Blount died before the filing oaf this bill. The sworn statement, if not admissible as testimony, is admissible as his receipt — but the actual payment of the i mi .. . . money, and its payment by Thomas Walker, is proved in Thomas Cox’s deposition. The main objection, then, mains, which is. that when the note in question was execu7 ' u ted, William L. Chesson and Abraham Howett constituted the firm of Abraham Howett & Co.; that the said William was solvent; and it was the duty of the executors of gins, and especially of Thomas Walker, who paid the note, to compel restitution of the money from Chesson. The only evidence offered by the plaintiffs, in support of the allegation that Chesson was a partner of the firm, is that of William I/. Chesson himself. He states that he and Abraham Howett constituted the firm of Abraham Howett & Co. from about the 25th of November, 1817, until the latter part of January or first of February, 1818, when the partnership was dissolved; and further states his belief that he was able to pay, and might have been compelled to pay, a debt of f1,500 to $2,000 at any time since 1819. The witness does not state that the fact of his being a member of this short co-partnership was notorious — nor indeed intimate that it was known to any but the persons constituting the firm. He does not insinuate that the action brought against him upon the note, and which he states was brought, as he believed, for the benefit of Wiggins’s estate, was not prosecuted in good faith. Though he was examined twice in relation to the suit and it is impossible to reconcile the two statements completely to each other. — .a discrepancy which we are disposed to attribute to his indistinct recollection of the circumstances attending a transaction that had occurred sixteen years before — it is apparent, from these statements, that he did not on the trial admit the fact that he was one of the firm of A. Howett *104 & Co. He says, that in order to prove that fact, they introduced Mr. Wills, the printer of a newspaper in Edenton, with his file of the paper containing notice of the co-partner-could shew no authority from the witness for making the publication. We mftst infer, therefore, that the fact was denied by him on the trial — and that it was not proved against him.-
^de®f“’|e the pay-“®"gyof made by the person who reeeiv*;®fore „th,e filing or the bin, if not as™Sno;.s. ?d" his receipt.
*104 But besides this, we have the testimony of John S. Smallwood, who, in December, 1817, sold the witness, Chesson, a large stock of goods. He informs us, that in about a month thereafter, Chesson' offered to the witness, in payment of the goods, three (notes of Abraham Howett & Co., amounting' to $3,600; and on witness demanding to know who composed this firm, was told by Chesson that it consisted of Abraham HoWett and Sylvanus Howett, and in a few days afterwards he received the same information from Abraham Howett. The witness refusing' to receive these notes, Chesson then offered him the notes of Abraham Howett & Co., payable tn Chesson, and by him endorsed, which witness did receive. It is further testified by this witness that Chesson lived in his employment as a clerk for four or five months, in the summer of 1818, and. the witness never heard from the said Chesson that he- was of the firm of Abraham Howett & Co., nor did witness know it, or know of any one who did. If it be admitted, therefore, that Mr. Chesson was, in truth, one of the firm liable on this note as principals, it is indisputable, we think, that the knowledge of that fact was industriously concealed so that no imputation of negligence can rest, upon Thomas Walker for being unable to-prove it — and unless he had good reason to believe the fact could be established by proof, there was no obligation on him to run the estate of his testator to costs, by bringing an action against Chesson. This is our conclusion, if the solvency of Chesson were unquestionable. But, upon this point, we have no doubt that whatever may have been his actual ability^ to pay, a demand of this amount, to the world the prosecution- of such a demand appeared a hopeless chance, until after his intermarriage with Miss Bozmanwhich did not take place until between 1824 and 1826. Un *105 der all these circumstances, it would be plainly iniquitous to make Thomas Walker’s estate lose the money so paid by him in discharge of a debt of his testator.
The 7th, 8th, 9th, 10th, 13th, 14th and 19th exceptions all relate to one and the same subject, viz. whether the estate of Thomas Walker be not chargeable because of receipts found by the Master to have come exclusively into the hands of John Walker, his co-executor. It appears that both John and Thomas qualified as executors of their testator at the May Term, 1818, of Washington County Court; that at the August Term following, John Walker, in .person, returned an inventory not subscribed by any one, but purporting to be an inventory taken by Thomas and John on the 25th July, 1818; that afterwards, at February Term, 1819, he returned an account of sales signed by the said John only, and purporting to be an account of sales of the perishable part of the property belonging to the estate of Samuel L. Wiggins oil the 12th of November, 1818 — and at the same term a further account of sales, subscribed by both John and Thomas, of sales made on the 14th of January, 1819 — and at the same term, a list of notes and bonds belonging to the estate of the deceased, subscribed by both the said executors. And it is insisted, by the plaintiffs, that these documents establish that these articles of property and choses in action came into the hands of both the said Thomas and John, and that the estates of both of them are, and each of them is, chargeable therefor in account with the residuary legatee and administrator de bonis non of their testator. We have not found it necessary to declare what liability would prima facie attach to the estate of Thomas Walker, by reason of the documents thus relied on by the plaintiffs; because the proof is satisfactory that all the proceeds of the property in question (except as to the sums which have been charged by the master tó tbe debit of Thomas Walker, and as to which his executors have not excepted,) did come directly and exclusively into the hands of John, without the agency or concurrence of Thomas. If it had been shewn that a part of the effects inventoried had been wasted — and a part of the debts which, by due diligence, might have been collected, had been lost to the es< *106 tate — the enquiry as to the extent of each executor’s liability, would have presented itself under a different aspect. But when the debts are actually collected by one executor only, and the product of the sales of the estate, whether the sales were made by one or both of the executors, is received by the same executor, and there is no. waste, unless it be from the misapplication . by that executor, of the funds thus rightfully in his hands, it seems to be the ordinary case, in which; it is well settled, that a devastavit by one of two executors shall not charge his companion who has not actively contributed thereto. One has as much authority to receive the assets as the other — and there is no obligation on either to prevent his companion from getting them into possession, under the penalty of becoming responsible for his misuse thereof. Ochiltre vs. Wright, 1 Dev. & Bat. Eq. Rep. 337. The fact that these assets did thus come exclusively into the possession of John, is positively testified by him; and there is a mass of evidence tending to corroborate his testimony. But it is denied,’that in this case, and for this purpose, he is a competent witness. As a suit in -equity frequently joins persons together as defendants who have several interests, it is a matter of course, before a decree made, for one -defendant, upon a proper allegation for that purpose, to obtain an order for the examination of his co-defendant as to certain matters in which the latter is not interested, saving to the plaintiff all just exceptions. This order will not be discharged, upon a suggestion that from the answer of the defendant.to be examined, he appears to have aninterest; but the objection must be reserved until the deposition is offered in evidence. It will then be a good exception that the witness examined has an interest in the matters examinéd to; and if this appear, his deposition cannot be read. But it is not a good objection that he has an interest in any other matters embraced in the cause, unless it call be seen that these matters will be affected by his examination. Murray vs. Shadwell, 2 Ves. & Bea. 404. Now the interest which forms the subject of exception to a witness, always means an interest adverse to the exceptant. It would be a singular objection to the reception of testimony, that he who testifies, *107 has an interest which may bias him in favour of the objector. The witness himself may demur to an examination against his interest; but this is an objection purely personal. See Nightingale vs. Dodd, Ambler 583. After a decree it is not a motion of course for one defendant to examine another, and a special ground must be laid for it. Lord Eldon however thought, that after a decree against three trustees to account, who were all answerable prima facie, it was a clear special ground for obtaining such an rorder, that the two sought to be examined had alone received the money.— Franklyn vs. Colquhoon, 16 Ves. 218. So that in our judgment there is no ground for the objection by the plaintiff ’to this defendant’s testimony. In addition to what has been ready remarked, there is a sufficient reason for overruling the 19th exception, for that the saméis immaterial, and ther sustained or disallowed, leads to no practical results.
reaverruUng" ®x®®P*.t is immsteFIR] * Rlltl whether dfs*Mowet'>Iead? no practical results,
The 11th exception is for that the master erred in not crediting the estate of. Samuel L. Wiggins in account with Thomas Walker, as executor, with the value of five shares of steamboat stock m the year 181.9, and the interest thereon. The facts in relation to the subject matter of this exception, are truly stated in’ the master’s report; and it is upon these facts the plaintiffs found their exception. Shortly before the death of Mr. Wiggins, a company had been formed for running a steamboat between Edenton and Plymouth; and Mit Wiggins subscribed for five shares of stock therein — each share one hundred dollars. On the 30th of November, 1818, about which time the boat commenced running, John Walker, who, until his insolvency, was the principal manager of the estate, paid $450 because of his testator’s subscription; and in October, 1819, paid tire residue of the subscription, $50, with $2 interest thereon-, and received-, in the name of the executors of S. L. Wiggins, a certificate- for five shares of stock. No dividends were ever declared on the stock; and the capital of the company, after running the boat some years, was wholly sunk. On the 13th of April, 1820, John Walker set up these shares for sale at auction; but failing to get a bid which he thought himself warranted in receiving, no sale was made. One sale of five shares of stock is proved to have *108 been made in 1821, by a proprietor, at the price of $>26 the share — and no others are shewn to have been made, nor is' the market price thereof otherwise proved. . If it were clear, Upon these- facts, that John Walker was liable, because of the failure to sell this stock before its worthlessness had been ascertained, there might be a question how far such liability could be raised against Thomas, who does not seem to have taken charge at all of this portion of his testator’s property. But it ought to be a plain case of neglect of duty which holds an executor responsible for a loss by holding on to property of this description bona fide, and in the exercise of his best judgment. We ought not to demand from trustees more than perfect honesty and reasonable diligence. It would be against conscience to require of the executors of Mr'. Wiggins an indemnity against his estate sharing in the fate which befell all — or nearly all — who adventured with the testator in this steamboat speculation.
The facts in relation to the subject matter of the 15th exception, are not very fully stated. The exception is, for that the master ought to have credited the estate of Samuel L. Wiggins, ánd debited that of Thomas Walker with the sum of $863, the difference between the value of certain negroes in 1818 and in 1821, when they were sold. All the facts disclosed in the case, are that the testator, who died in April, 1818, had been the guardian of Lawrence B. Wiggins — that at the Spring term, 1821, a decree was obtained in the Court of Equity for the county of Washington, on a bill filed in the name of the said Lawrence, by his then guardian, John Walker, against the said Thomas, as the executor of Samuel L. Wiggins; and that the negroes were sold immediately thereafter'to pay that decree. It is not denied but that the amount decreed was justly due — nor that the sale was necessary. — . nor that it was fairly conducted, and for a full price. But it is said, that had the executors used due diligence, they might have ascertained, soon after their testator’s death, that he was indebted to the estate of his ward, and that a sale of some of the negroes would be necessary to pay off this debt — that in the year 1819, there was a very sudden fall in the price of slaves — that in consequence of this fall, the slaves sold for *109 $863, less than they would have brought in 1818, or nina: of 1819: and that this loss should fall on the executors.' s ’ , ' Waiving the enquiry whether, if the case of the plaintiffs were fully supported, he could claim an indemnity against this unforeseen and indirect calamity, we hold that, no fraud being alleged or pretended, plaintiffs must make opt a plain-case of breach of duty. The plaintiffs have not shewn to us that the existence of this debt, and the necessity of the sale, were known before the matter of the claim was put into the train of judicial investigation, or that thpre was any delay in getting a decision upon the claim.
A Fa,ty cannot be J,°n'j,'”11' ceP!ion. ti»e matter of duemouv * ^™í-eThe mas
The 16th exception, which objects to any allowance being made of commissions to Thomas Walker, on his receipts and disbursements, is disallowed, because, in the judgment of the Court, nothing is shewn in the conduct of said Thomas, to destroy his claim to a reasonable commission.
The plaintiffs cannot be permitted to insist upon their 17th • i . i- i • i t •’ t •. exception, because the credit objected to was distinctly mitted before the master. •
The master’s report is, therefore, in all things, except as to the matter of the 4th exception, confirmed by the Court. The account being modified in consequence of the allowanee of that exception for $12, and $12 78 cts. interest thereon to the taking of the account, March 13th, 1839, exhibits a balance then due to the defendant of $252 34 cents.
It is admitted that there is no specific property belonging to the plaintiffs, which has not been delivered. It follows, then, that the bill of the plaintiffs must be dismissed; and, as we think, with costs to the executors of Thomas Walker.
Per Curiam. Bill dismissed.